**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2016-0583, <u>WHS Homes, Inc. v. Traditional Living, Inc. & a.</u>, the court on December 21, 2017, issued the following order:**

Having considered the briefs, the record submitted on appeal, and the oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. The plaintiff, WHS Homes, Inc. (WHS), appeals orders of the Superior Court (<u>McNamara</u>, J.) that pursuant to the Asset Purchase Agreement (APA) entered into by the parties, WHS is obligated to pay "trade payables" up to $1.7 million, and awarding the defendants, Traditional Living, Inc. (TLI), Tod H. Schweizer (Schweizer) d/b/a Lyme Investment Company and d/b/a Lyme Investment Partnership, Nestor, Inc., and SRS Partners, LLC, attorney's fees and costs. We affirm.

The pertinent facts follow. TLI, acquired in 1979 by Schweizer, manufactured log homes. In 2010, Schweizer decided to sell the business. William H. Silverstein, who owns and operates WHS, offered to buy the business. Among other proposed terms, Silverstein's Letter of Intent (LOI) proposed assuming $1.7 million of TLI's debt to its vendors. Such debts are also referred to in the record as "accounts payable," "trade payables," and "vendor payables."

In January 2011, the parties signed the APA. Although Silverstein's LOI promised that his company would pay the trade payables of $1.7 million, the APA does not include that language. The pertinent section of the APA provides:

1.2  <u>Assumption of Liabilities</u>. At the Closing, Buyer will assume only the following liabilities (the "Assumed Liabilities"):

(a)  liabilities reflected on the balance sheet (and schedules) of Seller attached as <u>Exhibit A</u> hereto (the "Closing Balance Sheet");

(b)  liabilities of Seller under the Assumed Contracts, including warranty issues, but excluding any obligations for pre-Closing default or breach by Seller for which Seller shall remain liable; and

(c)  liabilities of Seller for vacation time accrued by the Seller Employees . . . and not yet used as of the Closing Date. . . .

The total amount of the Assumed Liabilities shall not exceed One Million Seven Hundred Thousand Dollars ($1,700,000.00). Buyer expressly shall not assume, or be responsible for, any other liabilities or obligations of Seller or Stockholder, whether actual or contingent, matured or unmatured, known or unknown, and whether arising out of occurrences prior to, at or after the Closing (the "Excluded Liabilities").

At the time of the closing, liabilities existed under section 1.2(a) (the trade payables category) in the amount of approximately $1.8 million, under section 1.2(b) (the customer contracts category) in the amount of approximately $1.3 million, and under section 1.2(c) (the employee vacation category) in the amount of approximately $120,000.

The underlying suit between the parties commenced in 2012. Thereafter, WHS moved for summary judgment on TLI's claim that WHS had failed to assume $1.7 million of the trade payables required by section 1.2 of the APA. WHS argued that it had fulfilled its obligations under the APA by assuming approximately $2.2 million of TLI's liabilities, consisting of all of TLI's customer contracts and employee vacation time, sections 1.2(b) and (c) of the APA, and some of TLI's trade payables, section 1.2(a) of the APA. WHS asserted that the APA permitted it to choose among the categories listed in section 1.2 at its discretion. TLI countered that the APA required WHS to assume all $1.7 million of TLI's trade payables and that this interpretation is consistent with the parties' agreement prior to contracting.

The trial court determined that "each party's interpretation of the APA is reasonable" and that "the absence of a definition of priority or other clarifying term relating to WHS's obligation to assume certain categories of TLI's liabilities creates an ambiguity." Given that TLI had "produced substantial evidence indicating that the parties . . . intended WHS to assume a large percentage of trade payables," the trial court denied WHS's motion for summary judgment because there was "a genuine issue of material fact as to the parties' intent regarding the priority of 'Assumed Liabilities' and WHS's obligation to assume those liabilities."

A four-day bench trial was held in October 2015. The issues at trial included TLI's allegation that WHS was responsible for paying $1.7 million in trade payables pursuant to the APA, but did not do so, and WHS's allegation that TLI was liable to WHS for a number of missing assets that were not turned over at the closing. Relying upon extrinsic evidence, the trial court found that "the parties intended that WHS pay the trade payables up to $1.7 million prior to deciding whether to assume any other liabilities." The court determined that WHS had paid approximately $933,000, and Schweizer had paid approximately $456,000, to TLI's vendors. Therefore, the trial court ordered WHS to reimburse Schweizer for the $456,000 and to pay approximately $311,000 to

vendors.  The trial court also determined that WHS's missing assets claim lacked merit.  Subsequently, the court awarded TLI approximately $703,000 in attorney's fees and approximately $35,000 in costs.  This appeal followed.

On appeal, WHS contends that the trial court erred:  (1) by denying its motion for summary judgment; (2) in determining that extrinsic evidence demonstrated that the parties intended to prioritize the trade payables; (3) by not addressing WHS's claim that it was entitled to reimbursement of liabilities it assumed in excess of $1.7 million; and (4) in awarding attorney's fees.

As an initial matter, we decline to address the merits of WHS's claim that the trial court erred in denying its motion for summary judgment because WHS has not briefed "a fundamental preliminary question bearing on the issue: whether an erroneous trial court order denying summary judgment is reviewable on appeal where, as here, the case proceeds to the entry of a final judgment after trial."  O'Malley v. Little, 170 N.H. ___, ___, 169 A.3d 954, 957 (2017).  We have never addressed this question and do not do so now.  Id. at ___, 169 A.3d at 957.

In reviewing a trial court's decision rendered after a trial on the merits, we uphold the trial court's factual findings and rulings unless they lack evidentiary support or are legally erroneous.  Id. at ___, 169 A.3d at 957.  We do not decide whether we would have ruled differently from the way that the trial court did, but rather, whether a reasonable person could have reached the same decision as the trial court reached based upon the same evidence.  Id. at ___, 169 A.3d at 957.  Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence.  Id. at ___, 169 A.3d at 957.  We review the trial court's application of the law to the facts de novo.  Id. at ___, 169 A.3d at 957.

The interpretation of a contract presents a question of law, which we review de novo.  In the Matter of Liquidation of Home Ins. Co., 166 N.H. 84, 88 (2014).  When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole.  Id.

WHS first contends that it was error for the trial court to rely upon extrinsic evidence because both Schweizer and Silverstein testified at trial that the APA allowed Silverstein to decide to which of the three categories of liabilities he would apply the $1.7 million cap.  To support this contention, WHS points to certain of Schweizer's testimony.  The defendants counter that WHS takes Schweizer's testimony "out of context and ignores the substantial testimony where Schweizer persuasively testified that WHS was to pay the trade payables."  We agree with the defendants.

3

Although, at one point, Schweizer agreed that "it was up to [Silverstein] to decide which of the categories he could apply the cap to," Schweizer also testified that he understood that the offer made by WHS in its LOI — that it would pay the trade payables up to $1.7 million — was the deal that was encompassed in the APA. It was for the trial court to resolve this conflict in Schweizer's testimony, and we defer to its judgment in so doing. See O'Malley, 170 N.H. at ___, 169 A.3d at 957.

WHS next argues that the trial court erred in ruling that extrinsic evidence — including the LOI and WHS's conduct in the months after the closing — demonstrated that the parties intended to prioritize the trade payables in section 1.2 of the APA. WHS asserts that relying upon the LOI was erroneous because Schweizer testified that, upon execution of the APA, the LOI had no legal effect. The defendants counter that "[i]t is undisputed that payment of vendors was the predominant consideration in the LOI" and that the LOI therefore "provides helpful background in the parties' negotiations." According to the defendants, although "the APA language differs from the LOI, there is no evidence that the parties intended a multi-million dollar change in the month between the LOI and closing."

The trial court determined that "the LOI and the circumstances surrounding the execution of the APA" were relevant to determining the parties' intent about prioritizing the trade payables in the APA and, "in any event, [did] not contradict the APA." The court acknowledged that "as experienced businessmen, both Schweizer and Silverstein recognized that an LOI cannot . . . contradict the terms of an integrated agreement." However, it found that there was "ample and credible testimony that payment of vendors was the predominant consideration in the LOI and that the $1.7 million cap was derived from vendor payables."

The trial court credited the defendants' assertion that "the dramatic change from the LOI, which specifically provided for prioritization of vendor payables, to the APA, which was silent on the issue, is not evidenced by any document or e-mail record." As the court noted, "WHS's sole evidence of the change was Silverstein's testimony that WHS sent a redline document making the change to TLI, which never commented on it." WHS did not produce the redline document, and the court expressly did not credit Silverstein's testimony. Thus, contrary to WHS's position, the record supports that the trial court did not enforce the LOI, but, rather, properly considered it as evidence of the parties' intent.

The trial court also considered the conduct of the parties after the APA was executed, noting that "[t]here is no surer way to find out what the parties meant, than to see what they have done." (Quotation omitted.) See Birch Broad. v. Capitol Broad. Corp., 161 N.H. 192, 197 (2010) (explaining that the parties' intentions at the time of a contract's formation may be inferred from

4

the parties' actions after the contract was executed). We defer to the factual findings by the trial court if they are supported by the record and are not clearly erroneous. Id.

The trial court found that "in the months following the closing, WHS acted as though it was responsible for vendor payables." In challenging this factual finding, WHS argues that the trial court "[o]verlooked or discounted" certain testimony. However, any conflicts in the evidence were for the trial court to resolve in the first instance. See O'Malley, 170 N.H. at ___, 169 A.3d at 957.

The trial court also found, as further evidence that WHS acted as though it were responsible for trade payables that, in March 2011,

> the bookkeeper at WHS was tracking the TLI payables and prepared a spreadsheet which she referred to as the "paydown schedule." In an e-mail to . . . an accountant for WHS, she requested direction on what to tell vendors, who were all creditors of TLI. . . . Moreover, in a June 2011 meeting regarding a customer deposit dispute [the bookkeeper] prepared a document indicating that WHS believed that any unshipped contract or canceled contracts do not count against the $1.7 million cap, only refunded amounts due. This would be consistent with an agreement that WHS be responsible for prioritizing obligations and assume TLI's payables prior to assuming contracts, which in the unique circumstances of this transaction might not result in any net out-of-pocket cost.

The trial court reasoned that "[i]t would make no sense for [the bookkeeper] to prepare such a document if WHS thought there was no obligation to pay down TLI vendors." WHS quibbles with the trial court's reasoning, asserting that, in fact, the "paydown schedule process . . . reflected Silverstein's understanding of section 1.2 of the APA, and Schweizer's as well." We conclude that the trial court's reasoning does not constitute error.

WHS next argues that the trial court erred by not addressing its claim "that it was entitled to be reimbursed for having made total payments for the section 1.2 (a), (b) and (c) liabilities of $2,410,909.16." WHS asserts that "[b]ecause [it] was only required to assume liabilities of $1,700,000, it sought to recover from TLI the difference, $710,909.16." We disagree with WHS that the trial court failed to address its claim. Rather, the trial court rejected the underlying premises of WHS's claim for reimbursement that: (1) the APA allowed WHS to choose among the categories listed in section 1.2; (2) the APA required WHS to pay a total of $1.7 million for all three categories of liabilities, combined; and (3) WHS fulfilled its contractual obligation because the total amount of liabilities it assumed exceeded the $1.7 million cap.

Finally, WHS argues that "the trial court's finding that TLI was the prevailing party, and its award of attorneys' fees, was clearly erroneous." (Capitalization omitted.) "A prevailing party may be awarded attorney's fees when that recovery is authorized by statute, an agreement between the parties, or an established judicial exception to the general rule that precludes recovery of such fees." Tulley v. Sheldon, 159 N.H. 269, 272 (2009) (quotation omitted). We will not overturn a trial court's award of attorney's fees unless it is an unsustainable exercise of discretion. Id. In applying this standard, we are mindful of the substantial deference given to the trial court's decision on attorney's fees, and we will uphold the decision if the record provides some support for it. Id.

The trial court ruled that the defendants are entitled to fees pursuant to the indemnity provision of the APA, section 4.3, which provides that WHS

indemnifies, saves and holds harmless Seller . . . from and against any and all Losses suffered, sustained, incurred or required to be paid . . . in connection with or arising out of:

(a) the untruth, inaccuracy or breach of, or the failure to fulfill, any representation, warranty, agreement, covenant or statement of Buyer contained in this Agreement . . . ;

(b) the Assumed Liabilities;

(c) the use of the Assets by Buyer or the operation of the Business by Buyer following the Closing; or

(d) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including reasonable attorneys' fees) incident to any of the foregoing or to the enforcement of this Section 4.3.

According to WHS, the trial court "erred in awarding TLI its full legal fees, which included fees for the missing assets issue on which TLI prevailed" because "TLI's legal expenses for defending the missing assets claim are not covered by the plain language of section 4.3(d) of the APA." TLI counters that section 4.3(c) applies to both "'the use of the Assets by [WHS] or the operation of the Business by [WHS] following the Closing'" and that "[s]urely, WHS's claim about what assets it needed and expected to run the business 'arises out of' and is 'connected with' WHS'[s] use of the Assets or the operation of the Business." The trial court agreed with TLI, reasoning that "WHS's claim about what equipment it needed and expected to run the business life in the so-called 'missing equipment claim' 'arises out of' and 'is connected with' WHS's use of the equipment or operation of the business" by WHS following the closing. The

6

plain language of the indemnification clause in the APA supports the trial court's determination and, accordingly, WHS has failed to establish that the trial court's award of attorney's fees constituted an unsustainable exercise of discretion.

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and HANTZ MARCONI, JJ., concurred.

**Eileen Fox,**
**Clerk**

7